15-5072 Moriarty v. HHS. Mr. Shoemaker, please proceed. Good morning, Your Honor. May it please the Court, my name is Clifford Shoemaker and I'm representing Eilis Moriarty, the petitioner appellant in this case. Her father, Stephen Moriarty, is in the Court. And I would like to tell you a little bit about Eilis. Eilis developed an encephalopathy characterized by seizures, epileptic encephalopathy, that started five days after her second MMR vaccination. All of those facts are significant. Unlike the Cohn case, which some of the members of this Court have heard before, this case does not involve any issue of timing. As a matter of fact, the special master points out that the petitioners met prong three of all of them. The timing in this case was totally appropriate for an immune-mediated reaction after her second MMR vaccination. That evidence alone is strong evidence that this was an immune-mediated injury. There is no evidence in this case presented by anyone that there was any alternate cause. Treating doctors in this case even discussed the fact that they felt that the vaccination was the cause. Well, did they discuss the fact that they thought the vaccination was the cause? Or in three places, in three different medical records, in the background section, did they discuss that they had been told that the vaccination was the cause? I didn't see in those records an independent determination by those doctors in the form of an opinion that there was actual causation, but rather a recognition that someone had told them in the background when they were taking the medical information that it had been caused by. That is certainly a possibility. There is no evidence in the record that their statements are based on the mother's testimony, other than the fact that one of the statements says that the team, now the team is referring to the team of doctors. Okay, but if you're saying it's possible that what the government says about it being in the background section, that it was reported to them and not an independent opinion, the problem you have in this case is you have a very high hurdle to overcome, because as sympathetic as I might be to this young girl and her family's plight, I don't get to review this case de novo. I have to look for substantial evidence and arbitrary capriciousness at the decision below. And if you're admitting to me that the evidence could possibly be construed exactly the way the government says it should be and the way the special master already found it, then it's really hard for me on appeal to do anything but affirm that. I understand, Your Honor. And let me go to an issue that's not a fact issue, the issue of law. In this case, the special master dealt with the medical literature by talking about reliability of Dr. Shafrir's testimony. Incidentally, Dr. Shafrir has testified for the government. He's testified as a respondent's witness in cases. He's testified for petitioners in cases. Dr. Shafrir is clearly more qualified than Dr. McDonald, despite what the special master said. Dr. McDonald had never treated a case of epileptic encephalopathy. Dr. Shafrir has treated several. And Dr. Shafrir talked a lot in the – he discussed a lot of the progression of the disease in the case because that was important to his opinion. That's this logical sequence of cause and effect. It was very important to his opinion because it demonstrated what you would expect to see with an immune-mediated encephalopathy from an MMR vaccination. Now, the special master not only said that plausible medical theory or possible medical theory is not adequate, he said you'd have to have a probable medical theory. Probability is established in these cases by satisfying the three prongs of all. It's not each one has to be probable. It's that the medical theory has to be plausible. Granted, the government's experts said it was possible. And maybe plausible, possible, we're not going to get into that semantics argument, but I think it's at least evidence that supports our case. Dr. Shafrir testified that there are three ways that the MMR vaccination could have caused this encephalopathy. One would be that it awakened a dormant virus. Two would be a direct viral invasion. And three would be an immune-mediated event or what we call an autoimmune event. Many, if not most, of the cases in the vaccine program involve autoimmunity. That is, where the body's immune system becomes misdirected and attacks self instead of the antigens in the vaccine that it's supposed to attack. These reactions are very, very rare. Fortunately, they're very rare. We know that, for instance, measles and mumps and rubella can cause post-vaccinations or post-viral encephalopathy. And before we had the MMR vaccine, there were many, many cases of children coming down with encephalopathy after the natural infection. We also know that it's very rare, but it can occur after the live MMR vaccination. One of the articles that Dr. Shafrir cited in his report, the NCES study, demonstrates, and we know that. Can I ask you about this? Did the special master refuse to look at or disregard the studies cited in his report? There's a question in my mind about whether there were – but then he may not have opined on those reports when he actually gave his testimony, yet it seems to me that the special master was obligated to look at all of the evidence presented. And is one of your arguments that the special master erred by not taking into account those reports? It is, Your Honor, because he opined about those reports in his own report. Dr. Shafrir discussed the medical articles and the significance of those articles in his report. He not only talked about it in direct examination, but the special master also implied that talking about it on cross or on redirect was not as important as talking about it in direct. The record as a whole – I'm sorry, Your Honor. Let's go back. Did you say that your expert testified in reference to the different medical reports that – and that's this, the acute encephalopathy followed by permanent brain injury. Did your expert testify as to this particular report? In his actual testimony?  I don't recall, Your Honor, but I know he talked about it in his expert report, which is a part of the record that the special master has to consider. It's a part of the record as a whole. Is this how this report got into the record? Yes, Your Honor. Okay. Dr. Shafrir described, as I already said, the three ways. Timing, the timing in this case is also evidence. This is when autoimmune encephalopathy – Doesn't LALAND stand for the proposition that the type of literature you're talking about has to refer to the type of injury that the petitioner suffers? First of all, Your Honor, there's no requirement that the petitioner – I'm looking at the language in LALAND. Yes, Your Honor, I understand. I mean, one of the arguments against you here is that the literature you've cited in CES study and the other thing don't hone in on or discuss at all the specific type of injury that your client has suffered here. Yes, Your Honor, I think that – And if it doesn't describe that, then that – in LALAND, they said, okay, that literature is ineffective for purposes of often prone one. So where I'm standing from is that the literature that you feel was incorrectly overlooked here, you haven't made the case. In fact, you just admitted that it doesn't address the condition that your client had. So in the legal language, it would be harmless error. Just to be honest with you, that's my problem is with often prone one. You made the argument that the special master had in essence changed the law by requiring this degree of specificity, but that degree of specificity seems to me to be mandated by our precedent. If it's mandated by the precedent, then the examiner didn't misstate the law, and if he failed to spend enough time looking at that literature, it would be you haven't shown in your briefs why the error is harmful. Your Honor, the special master was requiring basically prong two of the Stevens analysis. He was requiring medical literature or proof in the scientific community. The often decision makes clear – if I may answer your question, Your Honor. Well, he's rejecting your possible plausible test, and that test was rejected in Moberly. But it was accepted in Andrade. Moberly says possible probable is not the statutory test. Well, Your Honor, if you can read Andrade and Moberly side by side and justify those decisions being on the same level. My problem is I've got to faithfully apply the precedent as it exists. Which is Andrade? Well, Moberly is on the books. It's on the books, Andrade is on the books, and Alton is on the books. Alton says that medical literature is not required. Alton also points out that Congress intended that we be allowed to use circumstantial evidence and inference. What the court is requiring in this case is what I, growing up in Iowa, used to refer to as a case on all fours. That is a case that's identical to the petitioner. Moberly precedes, comes before Andrade, right? Moberly comes after Andrade. I don't know if that makes any difference. I think if you look at Alton and Andrade together, and look at Pollock, and look at Tone, and look at the cases that are coming down today, we're looking at a situation where he clearly applied the wrong law. He clearly tried to impose a probable requirement on medical theory, which is not the requirement. That's putting the Stevens prongs back into the requirement. Is his reference and use of the word probable with respect to the Alton test, to a plausible theory, is it in reference to that, or to the standard of proof that's required overall in a vaccine case? Well, he's applying it to the prong one, in my opinion, and what I'm saying is all three of these things make up probability. You shouldn't apply probability to a single prong, prong one. That is not required. It's required to show a plausible medical theory. Dr. Shafrir did that. There is no evidence of anything else that the respondent says, well, these doctors that talked about it in the medical records were remote from the event. That's true because there had been no other alternate cause found, and very often when alternate causes are ruled out. Alternate cause found, there wasn't any adjudication of that issue, right? Of alternate cause? The government presented no evidence of an alternate cause. That's their burden of proof, not mine, to prove that there wasn't any, and there was nothing in the record. There's nothing from the respondents in the way of proof. Their expert didn't talk about an alternate cause. There's no evidence of an alternate cause in this case. We're talking about a logical medical theory. Why is the issue of any importance? It's important because, Your Honor, you're saying that we have to have medical literature that identifies identically everything in this case. That's not true. That's never been required. It should never be required. To require us to have a medical article that fits every single aspect of the case is illogical. We're allowed to use circumstantial evidence. We're allowed to infer from other articles and from other evidence in the literature. That's always been allowed. It should not be denied the petitioner in these cases, or we can't win any cases. If we had to have a medical article in every case that showed identical reactions, most of the cases in this program would not win, period. I'd like to reserve the rest. So I've got to overrule LaLonde? Excuse me? I have to overrule LaLonde? I think you have to rule in this case. I think you have to rule in the facts in this case. Okay, sir, we were bound by precedent. We were supposed to try to line these cases up so that they tend to make sense one against the other. Well, they're not lined up. If you line up Moberly and Andrea, they're not lined up. I'm sorry. Well, I'm talking about LaLonde now, where the language says that the literature in LaLonde that was being used to satisfy Alt and Prong 1, okay, failed both with regard to the timing of a two-phase event and the type of injury that LaLonde alleges. So, in other words, what you're saying is that... I'm just reading from the text of an opinion that binds me. I understand. So what you're saying is that if we don't submit any medical literature, which is not required under Altman, then we're better off than if we submit medical literature, which we think supports it through inference and circumstance, even though it's not directly on point. If you found an article directly on point for every one of these cases... Well, it's not so much directly on point. I think I don't read LaLonde to say that, to say that there's some indication in the reference that you're talking to that the condition that the client has is possible, is within the range of reactions that might occur. Well, the special master conceded that by saying that the timing fit. How can the timing fit if it's not appropriate? How can you have a medical theory? How can you say the temporal relationship is appropriate for this type of reaction, but the medical theory isn't there? How can you say that? The medical theory of causation. We know that MMR vaccines can cause encephalopathy. That's a given. We know it. We know that the MMR vaccine can cause encephalopathy characterized by epilepsy, by seizures. The question in this case was, they were saying, well, there wasn't testing done to prove that it was autoimmune in nature. How do we know the second point that you just made? Because seizures are a part of encephalopathy. If you look at the NCES study, if you look at the study referenced, all these studies, seizures are just a symptom of encephalopathy. That's all they are. As a matter of fact, this child's seizures were cured at Johns Hopkins, were stopped with a ketogenic diet. Okay, Mr. Shoemaker, you're well into your rebuttal time. Thank you. I think we should hear from the government. How do I say your name, counsel? Glenn McCloud. Mr. McCloud, please proceed. May it please the court, my name is Glenn McCloud and I represent the NLE in this case. This is a straightforward case concerning vaccine precedent. Elisa's case involves whether or not she suffered an autoimmune brain damage secondary to her second measles, mumps, and rubella or MMR vaccination in January of 2001. The special master in this case inherited the case from another special master who conducted the actual trial. The special master who inherited the case gave the opportunity to the petitioners to have a second hearing, which was declined by the petitioner and the respondent. So the special master reviewed the entire record of the testimony and the medical literature and the opinions, both written and oral. And based upon his evaluation, the totality of the evidence concluded that the petitioner had not presented a persuasive, reliable medical theory linking the MMR vaccination. It is helpful to have you explain the procedural history. Thank you for doing that. I have a question about it that is brought to mind by what you just said. One of the things this special master made quite clearly was a credibility determination as between the two experts. But according to the history that you just related, is it true that he did not actually first hand witness the testimony of either experts, but rather only had the same written record that I have in front of me because he was not, in fact, the special master who heard these two experts testify? Two points in response to this. First of all, you are correct. The special master in this case did not observe the experts testifying live in a testimony. However, and that's why I point out, he did give that opportunity to the parties. But he did have the transcript of testimony. The same thing I have, right? The same thing you have. The curriculum vites of both experts, the testimony of their experience. So what was his determination of credibility based on? As between these two experts. Tell me what is the substantial evidence that supports, because this is unusual. Usually I have to give so much deference to credibility determinations because maybe as the guy sat there, he was flinching or had a tick every time he said a certain word that made you think he wasn't telling the truth or something. You just don't know. You're not physically present watching the person in the courtroom. And so you really just can't replace your judgment for that of the special master's judgment. But here, he wasn't physically present watching the people in the courtroom. So actually I can, right? Because I can read the written record exactly as he can read the written record. So this isn't one of those situations where we usually give the same level of deference because we weren't physically present and he may have witnessed things that we can't step into his shoes and see. Although with all due respect, Your Honor, his decision in this case was not based on the fact that that was not the crux of his decision. But he didn't make a credibility determination, did he not? He weighed the opinions of the two separate experts in conjunction with the facts of the case. And that's very important as far as the opinion that provided by Dr. Shafrir in the case that the petitioner suffered, that the child suffered a specific kind of brain injury. And that is very relevant, an autoimmune-mediated encephalopathy or brain injury. And so the question is, do the facts of this case support that theory? Even if you assume Dr. Shafrir's theory is plausible or reliable, let's assume that that theory satisfied prong one of all. The key of this case is whether the logical sequence of cause and effect, based on the facts of the record evidence, not so much credibility of the opinions of the experts, but whether the logical sequence of cause and effect matches reliably, persuasively with Dr. Shafrir's. Would that determination in part depend on the determination made for prong one? And if you got prong one wrong, then wouldn't that taint your determination for prong two? Not necessarily, Your Honor, because I'm saying if you assume that the petitioner had a persuasive medical theory, that medical theory was tied to a very specific injury, autoimmune-mediated injury. Well, you heard me refer earlier to this particular report. Are you familiar with that? Which report, Your Honor? It's on A1459. Yes, sir. Are you familiar with that report? I am. Okay. Now, did the special master refer to this report at all in this decision? No, Your Honor. Okay. It was not referenced specifically. Okay. So we don't know if he considered this report or not. Wouldn't that be correct? There's nothing in the record that says he didn't respond to it. Okay. So I want you to look at the conclusion down here right underneath the abstract, which is the first three paragraphs of the report. And do you see there where the report specifically refers to the causal relationship between measles vaccine and the type of injury that we're dealing with here? Actually, Your Honor, it doesn't say that. What it says is the type of injury we're dealing here is autoimmune-mediated encephalopathy. I assume you're referring to the conclusion that says this clustering suggests that a causal relationship between measles vaccine and encephalopathy may exist as a rare complication of measles immunization. The government's expert in this case, when asked about whether measles vaccine can cause encephalopathy, said it is a possibility, which is consistent with this. But the crux of this case matches the approach that this court dealt with in the Hibbard case. Hibbard was cited by the special master in his decision, and that is that if you assume the accuracy of the petitioner's medical theory, it must fit the facts of the case. And yet in this case there is absolutely no credible evidence of an autoimmune-mediated process in this child. That is prong two. She's never been diagnosed with that condition? Not only has she not been diagnosed with an autoimmune-mediated encephalopathy, and to be clear on that, the theory that Dr. Shafrir posited was that the MMR produced a normal immune reaction that led to somehow led to the attack of her brain that manifested in seizures. So she suffered an acute brain injury as a result of an autoimmune- You're dealing with encephalopathy, right? Yes, Your Honor, but we're dealing with a specific kind of encephalopathy, and as the special master said in his opinion on page 23 and 24, he delineates very clearly that the second element to establish by preponderant evidence is a logical sequence of cause and effect showing that the MMR vaccine did in fact cause Elisa's autoimmune-epileptic encephalopathy. A logical presentation from petitioners would entail first showing that Elisa's response to the MMR vaccine was consistent with the theory, and her response was not consistent with this theory. Why was it not consistent with the theory? The special master articulates the basis. For example, if you had an autoimmune-mediated reaction, you'd expect to see the following things. Objective evidence of- this is on page 24 of his opinion, coming from Dr. McDonald. Objective evidence of an autoimmune encephalopathy may include brain swelling, an MRI. The brain in this case was normal except for inflammatory changes in the sinuses, which both experts indicated was not related to brain injury. Lateral and focal neurologic damage, elevated white cells, changes in gamma globulin levels, none of these are evidenced in this case. And then finally, an autoimmune process that affects the brain is likely to be visible on MRI, and the MRI would be grossly abnormal, EEG would show total disorganization, and seizures stemming from an autoimmune process would not be sporadic. Elisa's seizures were sporadic in the beginning. Her EEG was not consistent with that clinical presentation. The special master also pointed to the treating physician. They did not treat her for an autoimmune-mediated condition. Lending credence to the conclusion that she had not in fact suffered. Circumstantial evidence, mind you, not dispositive, but circumstantial evidence. And what about the- I'm probably saying it wrong, but the ketogenic diet? Is that tied to an autoimmune process? Isn't that tied to- at least the literature that I read suggested that that diet can be tried in many different kinds of seizure disorders, certainly to see improvement, but one of them was autoimmune, wasn't it? What I saw in the record, Your Honor, was that the ketogenic diet, which is a very high-fat diet that is used to replace glucose with ketones- Yeah, it's a four-to-one fat. I did some research on it because I wasn't sure what it was, so I went a little extra record on you just to understand what it was because I didn't know what it was they were talking about, and I was curious. So yeah, I learned a little bit about it. And I think Mrs. Moriarty may have testified that it was like a 90%- for Johns Hopkins, where she went, it was a 90% fat diet. But to answer your question, Dr. McDonald talked about it as being evidence of a metabolic disorder because it goes to the metabolizing of energy, of glucose or, in this case, ketone bodies. And so he indicated that that was actually circumstantial evidence of a metabolic underpinning for the seizure disorder. And didn't the neurologist say her EEG was consistent with the diagnosis of epilepsy? That is correct. And wouldn't that go against the passage that you just read about the autoimmune stuff? I don't believe so, no, Your Honor. Epilepsy is a generalized condition. There are many different causes for epilepsy. Not all epilepsy has even uncontrolled seizures, obviously. So I guess then I'm not particularly following you because I do see a lot of evidence that goes both ways, which in a case where I have to give a lot of deference, of course, favors an appellee. But I guess I'm not completely understanding some of these distinctions you draw. And why is it important to me? Why it's important to me is because, unlike your response to Judge Reina's question when he asked about 1459 and the relevance of that medical literature, that depending on some of these facts, and I don't think it is clear to me how the special master weighed them, but what does seem clear to me is that he expressly disregarded that evidence that Judge Reina cited to you because on page A19, he expressly says that there were studies attached to the expert's report but that he doesn't have to read these because when an expert does not explain the relevance of the article, a special master is not required to interpret it. And so it seems to me that he didn't just not talk about the studies that were attached to the end of the expert's report. I read his opinion as indicating that he is, in fact, not even going to use them. Well, all due respect, Your Honor, when I read that paragraph, it seems to the appellee that what he's saying is when an expert lists medical literature, and this clearly doesn't indicate that the special master didn't consider it, it's trying to understand the relevance of the article to the theory proposed by the expert, a special master is not required to interpret what is the specific relevance. For example, that particular article is very general and is based upon claims in the vaccine adverse event reporting system. But Dr. Shafir himself did not explain in any detail the relevance of it. And the special master is simply requiring the petitioner, if they provide literature, if they provide it. So what would happen if the Wabel article at 1459, at the point where Judge Reyna drew your attention to the conclusion, remember that? Yes, Your Honor. If it said that clustering suggests a causal relation between measles vaccine and encephalopathy, including autoimmune mediated encephalopathy. Let's assume that it said that. Very good. And the special master had ignored or had not paid any attention in his opinion to that article. Wouldn't that be a reversible error? If the article's relevance to the facts and circumstances of the case rise to the level that a special master ignores totally, yes. Given the way this opinion was written. The reason why I'm asking the question is because what I'm trying to get you to tell me is whether or not, as was in Lalonde, literature can be overlooked or ignored or deemed to be irrelevant unless the literature actually refers to the type of condition that the petitioner is alleged to have. Yes, Your Honor. And that's the way you read the law? I do, Your Honor. It's a question of relevance and weight to be given to the medical literature that's used to support an opinion. You have a case other than Lalonde to support that proposition? About the... It's a specificity. What I'm trying to get at is there's a real debate going on in this courtroom right now between your adversary and yourself about the degree of specificity that has to exist in the prior art, as we call it in the patent world, in the literature. When you're trying to look to the literature to see whether or not there is a theory of causation that passes muster under prong one of all. And I hear you to be saying that literature doesn't qualify... No, Your Honor. ...unless it refers specifically to the condition that the petitioner thinks they have. It's a question of weight, the weight to be given to the relevance and persuasiveness of the medical literature. If the medical literature has... Let's assume, for the sake of argument, your point that the medical literature specifically talks about the injury at issue, then that's very relevant. And if a special master completely ignores that element of evidence, that would be a question for the court to determine whether that was error. However, it's a question of weighing the literature and its relevance to the theory propounded. If the medical literature has only tangential relevance, it doesn't mean the special master ignores... Don't you think the special master ought to tell us in his or her opinion that I've looked at all the evidence and this evidence is only tangentially interesting or it's irrelevant? Irrelevant, tangential, more interesting, very interesting. Your Honor, I see my time is up. As far as I'm concerned, you can answer the question. Thank you, Your Honor. It would be helpful if the special master did so, but it's not required in his opinion to go through every piece of evidence that was presented. He cited the Murphy case in our brief for that proposition on page 17, that a special master need not discuss every piece of evidence in the record so long as his decision makes clear that he fully considered a party's position and arguments on point, and he did that in this case. Can I just ask one other quick question? Sure. I'm now concerned with the sort of ideology of this particular case. You've got one special master, right, who conducts a hearing, right? Yes, Your Honor. And that special master presumably has looked at all the literature and done all the preparation for the hearing the way we prepare for our hearings, right? Yes, Your Honor. And then you've got another special master comes in, and the special master that comes in makes a credibility call, which is suspect in a way because we don't quite know what he means by credibility because he clearly couldn't have observed the witnesses. So you couple that what I'll call questionable credibility calling, which is adverse to the petitioner, how much weight you say, and then you've got an opinion of the second special master calling into question the extent to which the second person looked at the literature. And couldn't a reasonable person put those two things together and say, I don't have a good feeling about the final decision here. Maybe this ought to go back and the special master ought to understand that he's got to get the thumb off the scale if it's there or credibility or at least explain more what the credibility call is because he's taking one doctor out who actually has supposedly more experience than the other. And secondly, talk to us about the literature. Why wouldn't that be a just result given what I call the shaping of how this case happened? Because the special master did more than just make credibility findings and talk about isolated piece of the evidence. I think we have to look at the totality of the approach. How do I know how much the credibility call weighed in the mind of this second special master? How do I know that it only mattered a little bit the way you're telling me as opposed to it mattered a great deal? Well, certainly if this court finds that the special master did not draw plausible inferences from the evidence or erred in that consideration. I'm not talking about that. I'm just talking about the shape of the case, how it happened. Well, the judge Wheeler in the court below and the government feels that the special master in this case did a fine job in examining the evidence and weighing the totality of the evidence. We don't see that there's an error in his approach to it based on his opinion or prior precedence of this court. Thank you, counsel. Thank you, Your Honor. Two minutes of rebuttal time, please, for Mr. Schumacher. Judge Clevenger, if you would look at that article you were just talking about and you read from the conclusion and you wanted to know if that was an autoimmune encephalopathy, would it be different? Go over to the right-hand column of that article. The top of it talks about what I talked about. The right-hand column on the same page? On the same page. And how far down? And down to two sentences up above the bottom paragraph. It says, The cause of this acute monophasic encephalopathy that occurs in the absence of a detectable virus in the brain is obscure but may be suggestive of an autoimmune encephalopathy. And it goes on to say, Case reports and reviews suggest that similar neurological complications can less frequently What about autoimmune-mediated encephalopathy? Is that different? No, autoimmune is autoimmune. The reason we know this is autoimmune, Your Honor, is because vaccines are designed to create an immune reaction. In most cases, that's a good reaction. In a few very rare misdirected cases, the immune system becomes misdirected and attacks self. That's what we mean by immune-mediated or autoimmune. We know that's how these cases occur. We know that encephalopathy following MMR vaccine is probably autoimmune. This article discusses exactly what Dr. Shafrir said. The theories of how this happens are dormant virus, virus infecting the brain, but the most likely one is this autoimmune, which is described right in this article. We know it from the timing. Even the special master in this case recognized that five days was a little soon for a typical MMR encephalopathy, but he pointed out correctly that this was the second MMR vaccine, so you would expect to see the reaction quicker because when you get the first vaccine, you have a reaction within a certain period of time. When you get the second vaccine, you have a booster response, which is quicker. So that's why he said the five days was an appropriate temporal relationship. He based the appropriate temporal relationship on autoimmunity, principles of autoimmunity. Tests were not done to prove that. We can't blame Eilis for the doctors not performing the exact medical tests that would have confirmed, and we wouldn't be here today. The fact those tests weren't done doesn't mean that the evidence doesn't point to it completely. Okay, Mr. Schumacher, your time is up. Thank you. We can move on to our next case.